# STATE OF MICHIGAN

# COURT OF APPEALS

RONALD RITARI, JR. and TAMA RITARI

Plaintiffs-Appellees,

v

PETER E. O'DOVERO, INC., doing business as
MARQUETTE MOUNTAIN,

Defendant-Appellant.

UNPUBLISHED
October 24, 2017

No. 335870
Marquette Circuit Court
LC No. 16-054384-NO

Before: K. F. KELLY, P.J., and BECKERING and RIORDAN, JJ.

PER CURIAM.

In this interlocutory appeal,[1] defendant, Peter E. O'Dovero, Inc, d/b/a Marquette Mountain, challenges the trial court's order denying defendant's motion for summary disposition under MCR 2.116(C)(7) (release, immunity granted by law) and (C)(10) (no genuine issue of material fact, movant entitled to judgment as a matter of law). The case arises out of an incident at Marquette Mountain ski resort that occurred when plaintiff, Ronald Ritari, Jr., was riding up the ski hill on a chair lift and became entangled in a rope that had been installed underneath the lift, which pulled him off the lift and caused him to sustain serious injuries in the ensuing fall.[2] Because material questions of fact remain, we agree with the trial court that summary disposition is inappropriate at this time.

---

[1] *Ronald Ritari Jr v Peter E O'Dovero, Inc*, unpublished order of the Court of Appeals, entered April 20, 2017 (Docket No. 335870).

[2] Plaintiff Tama Ritari's claim is derivative of her husband's; therefore, "plaintiff" refers to Ronald Ritari, Jr.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On the evening of January 29, 2015, plaintiff went to Marquette Mountain to ski. He was a season pass holder there and enjoyed NASTAR[3] racing. According to plaintiff's complaint and affidavit, at around 6:45 p.m. he and his son boarded a chair lift to reach the top of the hill for their first run of the evening. They planned to take a couple of pleasure runs down the hill before their Thursday night ski league began. When his chair was approximately 20 yards from the loading zone, a gust of wind pulled the chair down and the tips of plaintiff's skis became entangled in a nylon rope attached to the ground by two poles directly below the chair lift. Plaintiff was able to free the tip of his left ski from the rope, but he was unable to free the tip of his right ski, and he felt his leg being pulled backward as his chair continued to move up the hill. Plaintiff grabbed the middle pole of the chair to keep from falling and screamed as loudly as he could for the chair lift operator to stop the lift. But the chair lift did not stop, and plaintiff was pulled out of his chair by the rope. He fell approximately 12 feet to the ground and sustained a fractured pelvis and fractured ribs.

Plaintiff filed suit against defendant, alleging that the ski area was negligent by having ropes in the area of the chair lift, failing to post warnings of the danger, failing to take measures to prevent plaintiff from catching his skis on the rope, failing to employ the emergency stop when plaintiff yelled for help, and failing to adequately supervise and control the chair lift. Before any discovery began by way of interrogatories, depositions, or otherwise, defendant moved for summary disposition under MCR 2.116(C)(7) and (C)(10), contending that plaintiff had signed releases broad enough to bar any claim for injuries arising out of the incident. Defendant relied on three forms signed by plaintiff.

Specifically, On December 13, 2014, in conjunction with purchasing an annual ski pass at Marquette Mountain for the 2014-2015 season, plaintiff signed a release wherein he agreed to assume "the risk of any injury to person or property resulting from any of the inherent dangers and risks of skiing/snowboarding . . . ." On December 16, 2014, he filled out a document in order to participate in NASTAR races. The document, a single sheet of paper, contains two forms, one on the front and one on the back. Hand-printed vertically in capital letters along the right side of both forms are the instructions, "FILL OUT BOTH SIDES."

On the front side of the NASTAR document is a registration form. The form has headings entitled "Registration Form," "Racer Information," "Team Information," and "Waiver and Release of Liability." According to the release language on this form, plaintiff, "in exchange for being permitted to participate in NASTAR events (the "Event"),", assumes all risks associated

---

[3] According to its website, NASTAR is the "largest public grassroots ski racing program in the world" and "gives recreational racers an opportunity to compete and compare their scores to friends and family regardless of when and where they race using the NASTAR handicap system." NASTAR competitions typically occur on grand slalom and slalom courses laid out by the host ski resorts in accordance with NASTAR's instructions. http://www.nastar.com (accessed 9/15/17).

with his involvement in the event and the "risk of injury caused by the condition of any property, facilities, or equipment used during the Event, whether foreseeable or unforeseeable."

On the reverse side of the NASTAR document is a release entitled "Marquette Mountain Ski Area, and Competition Participant" (henceforth, the "Participant release"). According to the relevant terms of this release, "Participant, the undersigned, being at least 18 years old . . . agrees and understands that alpine skiing and snowboarding in its various forms (hereinafter the "Activity") is **HAZARDOUS[4] and may involve the risk of physical injury or death**." The Participant also agrees that "training or racing competitively is more HAZARDOUS than recreational skiing," that he or she is "a competitor at all times, whether practicing for competition or in competition." According to the release, the Participant assumes all risks associated with the Activity, including but not limited to the risk of all course conditions, course construction or layout and obstacles, risks associated with riding the lifts, and risks associated with ski lift operations and acts or omissions of employees. The Participant agrees to release defendant from "all liabilities" arising from engagement in "the Activity," including any injuries caused by the actual negligence of defendant's employees. In its motion for summary disposition, defendant contended that, by signing this release, plaintiff assumed "all" risks, argued that "all" left no room for exceptions, and stressed that the terms of this release barred plaintiff's claim for negligence as a matter of law.

In support of its motion, defendant also argued that MCL 408.342(2), the assumption of risk provision in the Ski Area Safety Act of 1962 (SASA), MCL 408.321 *et seq*., operated to bar plaintiff's claim because risks associated with fencing and falling from a chair lift inhere in the sport of skiing.

Plaintiff countered that neither the season-pass release nor the assumption of risk provision in SASA barred his claim because the inappropriate placement of a rope directly under the chair lift was not an inherent risk of skiing. Additionally, plaintiff argued that the rope was not necessary because its placement violated the standards governing minimum clearance between a chair lift and an obstacle below, and it was not obvious because he neither saw it nor expected it to be placed where it was. He further argued that neither side of the executed NASTAR document barred his claim because he was not engaged in a NASTAR event, nor was he training for such an event when he was injured. Finally, plaintiff contended that there remained genuine issues of material fact regarding whether defendant's chair lift personnel were inattentive and failed to timely shut off the chair lift when the rope entangled him, and that this was not a risk assumed pursuant to the assumption of risk provision of SASA.

---

[4] A fold or wrinkle in the copy of the release that is in the record obscures this word. However, defendant quotes the relevant section of the release in its motion for summary disposition as "I further agree and understand that training or racing competitively is more HAZARDOUS than recreational skiing."

At the motion hearing, defendant argued that the Participant release on the back side of the NASTAR document applied not just to competitions and training for competitions, but to "skiing in all its forms." Accordingly, the Participant release controlled resolution of the matter and insulated defendant from any alleged negligent placement of the nylon rope. At the same time, defendant insisted that it had not been negligent in placement of the rope at issue because the rope's location complied with required clearance standards and was necessary to the safety of skiers.[5] Plaintiff reiterated his argument that the forms on both sides of the NASTAR document pertained to participation in competition-related skiing, and that the rope at issue was neither necessary nor obvious with respect to any assumption of the risk plaintiff assumed when signing up for his season pass or through SASA.

Ruling from the bench, the trial court noted that construing the viability of plaintiff's claim under SASA turned on necessary factual findings yet to be made, rendering summary disposition inappropriate at that point in the proceedings. With regard to the releases, the trial court observed that the parties' arguments were geared toward the form on the reverse side of the NASTAR document. The trial court easily dispensed with the front page as being race-related. As for the back side, the Participant release, the trial court concluded that there were questions about the extent to which the release might apply to relieve defendant of liability outside the context of racing or training.

In addition to its location on the back of the NASTAR form, the trial court pointed to three phrases in the Participant release that seem to limit the scope of that release to training for or participating in a competition. The first is the phrase in which the participant agrees with the premise "that Participant is a competitor at all times, whether practicing for competition or in competition." The second is the provision, "Participant is always provided an opportunity to and will conduct a reasonable visual inspection of the training or racecourse." The third phrase is, "I further agree and understand that training or racing competitively is more [hazardous] . . . than recreational skiing." The trial court described the language of the release as "a little ambiguous" and concluded that in light of the questions about the extent to which the release might apply to relieve defendant of all liability at any time, even when the person who signed it is simply recreationally skiing, summary disposition was premature.

---

[5] Defendant acknowledged plaintiff's argument about the front side of the NASTAR document focusing on event racing and the fact that the release language there and in the season pass document coincides with the language of SASA, which is commonly referred to as the assumption of the risk clause. As such, while arguing that the rope at issue was a necessary and obvious danger, defendant focused on the back side of the NASTAR document and its "sweeping" release of defendant's own negligence for the purpose of his motion for summary disposition at such an early stage in the litigation.

## II. ANALYSIS

Defendant contends that the trial court erred in denying its motion for summary disposition because the unambiguous language of the December 16, 2014 Participant release releases it from all liability regardless of whether plaintiff was injured while practicing for a competition, in competition, or simply skiing recreationally. It also claims that it is entitled to summary disposition under the assumption of the risk statute in SASA, MCL 408.343(2). We conclude that defendant is racing too quickly to the finish line in this case, to which it may or may not be entitled a victory.

We review de novo a trial court's ruling on a motion for summary disposition, *Casey v Auto Owners Ins Co*, 273 Mich App 388, 393; 729 NW2d 277 (2006), as well as issues involving contractual and statutory interpretation, *Rodgers v JPMorgan Chase Bank NA*, 315 Mich App 301, 307; 890 NW2d 381 (2016).

## A. RELEASE

Summary disposition under MCR 2.116(C)(7) is appropriate where the terms of a release bar a claim. As this Court has explained,

> The scope of a release is governed by the intent of the parties as it is expressed in the release. If the text in the release is unambiguous, the parties' intentions must be ascertained from the plain, ordinary meaning of the language of the release. A contract is ambiguous only if its language is reasonably susceptible to more than one interpretation. The fact that the parties dispute the meaning of a release does not, in itself, establish an ambiguity. [*Cole v Ladbroke Racing Michigan, Inc*, 241 Mich App 1, 13-14; 614 NW2d 169 (2000).]

In addition, a contract must be read as a whole, *Dobbelaere v Auto-Owners Ins Co*, 275 Mich App 527, 529; 740 NW2d 503 (2007), and "construed so as to give effect to every word or phrase as far as practicable," *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003). See also Restatement Contracts, 2d, § 202, p 86 ("a writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").[6] The interpretation of an unambiguous contract is a matter of law. *Mich Nat'l Bank*, 228 Mich App 710, 714; 580 NW2d 8 (1998).

After our review of the language of the Participant release, we disagree with the trial court's conclusion that the language of the release is ambiguous, or in other words, "reasonably susceptible to more than one interpretation." *Xu v Gay*, 257 Mich App 263, 272 668 NW2d 166 (2003) ("A contract is ambiguous only if its language is reasonably susceptible to more than one interpretation."). However, we agree with plaintiff, not defendant, as to its meaning and scope. Several factors indicate that the NASTAR registration and Participant release were part of the

---

[6] See also Restatement Contracts, 1st, § 235 ("A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together.").

same transaction—which is in fact undisputed—and therefore, should be read and interpreted together: the "Participant" release is on the reverse side of the NASTAR registration form, both forms bear the handwritten instruction to "fill out both sides," and plaintiff executed both releases on the same date specifically in order to participate in NASTAR races. We conclude that, when read as a whole and interpreted in conjunction with the NASTAR registration form on its reverse side, the language of the Participant release is unambiguous and intended to relieve defendant of "all liability" for injuries suffered during training for or participating in a racing competition.

As noted above, the trial court identified three examples where the language of the release focuses specifically on competitive skiing. After identifying the "Activity" in which the Participant is participating as "alpine skiing and snowboarding in its various forms" and noting that it may involve physical injury or death, the release requires the participant to "*agree and understand* that training and racing competitively is more [hazardous] than recreational skiing" (emphasis added). In addition, the release requires the participant to "*agree* with the Premise that Participant is a competitor at all times, whether practicing for competition or in competition" (emphasis added). Note that it does not also say when simply pleasure skiing or taking the children out for lessons on the bunny hill. Further, the Participant is required to "*agree* that Participant is always provided an opportunity to and will conduct a reasonable visual inspection of the training or racecourse" (emphasis added). This focuses on race-related activities. Even without consideration of the NASTAR release, the fact that the Participant release requires the participant to agree expressly to statements emphasizing the dangers of training for and participating in competitive racing specifically renders the release susceptible to the interpretation that its focus is on insulating defendant from liability for injuries sustained by participants when training for or competing in races.

Defendant contends that the Participant release's acknowledgement that competitive racing is more hazardous than recreational skiing does not restrict the release's scope to competitive skiing. However, the release does more than merely acknowledge the dangers of competitive skiing; it requires the Participant to expressly agree that competitive skiing is more hazardous than recreational skiing. Moreover, under the defendant's alleged interpretation, the Participant's acknowledgement that he or she is a competitor at all times renders it impossible for the person who signs the release as a "Participant" to ever ski recreationally. According to the logic of defendant's argument, once a person fills out the NASTAR registration form and accompanying Participant release, he or she is a "competitor" indefinitely, regardless of whether he or she is actually competing or training for a competition.[7]

---

[7] Under defendant's proposed at-all-times interpretation, there is no time frame for how long someone is considered to be a Participant if that word is not tied to actual racing or training. Are they deemed to be a Participant for the rest of the season? Indefinitely? What if they only participated in one race? In doing so, have they given up all rights they might otherwise have had as a recreational skier? And where does it say that in the release? Defendant's proposed interpretation creates an ambiguity that it cannot resolve within the confines of the agreement.

-6-

Other portions of the Participant release also support the conclusion that the unambiguous language limits its scope to liability for injuries suffered during or while training for a ski or snowboard competition. The heading contains what one might reasonably construe as an identification of the parties to the release, "Marquette Mountain Ski Area, and Competition Participant." The comma inserted between "Marquette Mountain Ski Area" and "Competition Participant" suggests that the release involves Marquette Mountain Ski Area on one side, and a "competition participant" on the other. Defendant urges this Court to ignore the "competition participant" designation, arguing that it is not part of the four corners of the agreement and is neither used nor defined in the release. However, interpreting the NASTAR release and the Participant release together makes clear that "competition participant" refers to the person participating in the NASTAR competition that defendant is hosting.[8] Further, if "competition" refers only to the NASTAR event, but "participant" can have more than one referent,[9] it seems reasonable that the release would focus on defining "participant" to ensure inclusion of all the word's possible meanings. Additionally, that the participant is "a competitor at all times" harkens back to "competition participant" in the heading, again allowing one to reasonably interpret the release to pertain only to the release of liability arising from injuries associated with training for or racing in a competition.

Moreover, the Participant warrants in the Participant release that he or she is in good health and has left no special instructions "that have not been listed on the registration form." Although the Participant release makes no further mention of a registration form, the NASTAR document on the reverse side is both a registration form and a release, and it contains a 'Physically Challenged" heading where competitors may identify their physical or intellectual challenges.

Finally, defendant asserts that "alpine skiing and snowboarding" is not limited to competitive racing. This is true; "alpine skiing" may refer to downhill skiing for sport or recreation. However, interpreting the Participant release with the NASTAR release renders the phrase "alpine skiing and snowboarding in its various forms" susceptible to the interpretation that it refers specifically to the three downhill disciplines from which participants may choose to compete at a NASTAR event: alpine skiing, snowboarding, and telemarker (which combines elements of Alpine and Nordic skiing).

Given the foregoing analysis, we conclude that the trial court correctly denied defendant's motion for summary disposition associated with the Participant release, but it erred to the extent it deemed the release language ambiguous. Assuming factual development establishes that plaintiff was not engaged in training for or competing in racing activities at the time of his injury, as plaintiff contends it will, the Participant release does not apply. Moreover,

---

[8] The mere fact that the release uses the word "Participant" conjures up images of participation in something; it would not lead the reader to conclude that one is a Participant whenever they are on the slopes, even when they are not actually participating in anything or training for anything.

[9] E.g., "participant" includes a person at least 18-years old, a participating minor, and the parents or legal guardian of as well as his or her parent or legal guardian.

for the reasons set forth below, determination of whether the release language in plaintiff's season pass bars his claim—which entails an assumption of the risks inherent in skiing analysis—will depend on further factual development gleaned from discovery, which has not yet begun.

## B.  MCL 408.342(2)

A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Smith v Globe Life Ins Co*, 460 Mich 446, 454; 597 NW2d 28 (1999).  Summary disposition under (C)(10) is proper if the documentary evidence filed by the parties and viewed in the light most favorable to the party opposing the motion fails to show a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996).

The Legislature enacted SASA in 1962, and amended it in 1981. *Kent v Alpine Valley Ski Area, Inc*, 240 Mich App 731, 737; 613 NW2d 383 (2000) (quotation marks and citation omitted).  One of the purposes of the Legislature's amendment was "to make the skier, rather than the ski area operator, bear the burden of damages from injuries." *Id*.  Thus, among the provisions in the 1981 amendment was one for the acceptance of risk by skiers, MCL 408.342(2), which provides as follows:

> (2) Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary.  Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees, and other forms of natural growth or debris; collisions with ski lift towers and their components, with other skiers, or with properly marked or plainly visible snow-making or snow-grooming equipment.

Where, as here, an injury results from a hazard not listed in the statute, Michigan's Supreme Court has established a test to determine whether a defendant ski resort is nevertheless immune on grounds that the hazard is of the same type as those listed in the statute. *Anderson v Pine Knob Ski Resort*, 469 Mich 20, 24-25; 664 NW2d 756 (2003).

At issue in *Anderson* was whether the assumption of risk provision barred the plaintiff's suit for injuries suffered when he collided with a timing shack during a skiing race.  The Supreme Court determined that the different types of hazards listed in MCL 408.342(2) had in common "that they all inhere in the sport of skiing and, as long as they are obvious and necessary to the sport, there is immunity from suit." *Id*. at 25.  Thus, once a hazard is determined to be inherent to the sport of skiing, "only if [it is] unnecessary or not obvious is the ski operator liable." *Id*. at 26.  Applying the facts of *Anderson* to its legal conclusion, the Supreme Court reasoned:

> There is no disputed issue of fact in this matter that in ski racing, timing, as it determines who is the winner, is necessary.  Moreover, there is no dispute that for the timing equipment to function, it is necessary that it be protected from the elements.  This protection was afforded by the shack that all also agree was

obvious in its placement at the end of the run. We have then a hazard of the same sort as the ski towers and snow-making and grooming machines to which the statute refers us. As with the towers and equipment, this hazard inheres in the sport of skiing. The placement of the timing shack is thus a danger that skiers such as Anderson are held to have accepted as a matter of law. [*Id*. at 25-26.]

Accordingly, the Supreme Court concluded that the ski operator was immune from suit because the timing shack was a hazard inherent to skiing, and it was necessary and obvious.

We conclude that the trial court did not err in finding that, at this early stage of the proceedings, the record facts are simply insufficient to determine whether SASA applies to bar plaintiff's claim. There is no dispute that the nylon rope that entangled plaintiff is a hazard not listed in MCL 408.342(2). Thus, the question is whether the placement of a nylon rope under a chair lift is inherent to skiing and, if so, whether placement of the rope in this case was obvious and necessary. For defendant to be entitled to summary disposition under MCR 2.116(C)(10), these material facts must be undisputed and defendant must be entitled to judgment as a matter of law. *Quinto*, 451 Mich at 362.

However, the parties dispute the material facts. And the record evidence—given that discovery has not yet begun—is not sufficient to resolve their disputes. For example, although both parties agree that the American National Standards Institute (ANSI) standard B77.1-2006 governs the construction, installation, and operation of a ski lift, they dispute whether defendant's positioning of the rope violated the clearance requirements set forth in ANSI, and whether such violation renders defendant liable for injuries attributable to the violation. In fact, there is no record evidence as to what the rope was even for, making impossible at this point a determination of whether it was a necessary part of skiing. Plaintiff asserts that defendant's placement of the rope "in an area directly below the chair lift" violated the ANSI standards, and that the rope was neither obvious nor necessary. Defendant contends that plaintiff's allegation that his fall to the ground was approximately 12 feet demonstrates that defendant complied with the requirement to have a clearance of at least 8 feet between the lowest point of the carrier and the terrain. In addition, defendant characterizes the rope as a "fence," and asserts, "fencing and its risks are intrinsic in the sport of skiing," and further asserts that the rope/fence was absolutely needed to prevent skiers from traveling under the chair lift and being injured." However, because there is nothing in the record evidence indicating the rope's purpose or its location relative to the chair lift and the terrain, it is impossible to determine where the rope was placed and whether it was necessary. Defendant contends that plaintiff's description of his fall in his affidavit demonstrates that there was at least an 8-foot clearance between the carrier, but defendant has not eliminated the possibility that the rope was too close to the carrier when it caught plaintiff's skis, and it begs the question of why there was a rope if the minimum clearance did not require one. In short, defendant has not met its burden to submit affirmative evidence indicating that it was entitled to summary disposition on grounds that the dangers posed by the

nylon rope at issue were inherent to skiing, and that they were necessary and obvious.[10] *Quinto*, 451 Mich at 362.

        Affirmed.

/s/ Kirsten Frank Kelly
/s/ Jane M. Beckering
/s/ Michael J. Riordan

---

[10] Because we conclude that defendant's motion for summary disposition was properly denied at this stage of the case, we need not address plaintiff's additional argument that SASA does not bar his claim arising from the chair lift operator's alleged failure to stop the chair lift after plaintiff became entangled in the rope.